## THE PHIL., W. & B. R. CO.'S APPEAL.
## [PHIL., W. & B. R. CO. v. CHESTER CITY.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF
DELAWARE COUNTY.

Argued February 7, 1888—Decided October 1, 1888.

1. Under the special act of March 25, 1873, P. L. 376, the city of Chester
had power to make a lawful contract with the P. W. & B. R. Co. by
which, in consideration of a bridge of a specified character on Pennell
street over the railroad crossing, to be erected and donated by the com-
pany, the grade of the street should be fixed and established so that the
street when opened and used over said bridge should cross the railroad
at such a height as to permit the free operation of the railroad there-
under; by such contract the city was bound as if it were an individ-
ual, and the rights secured to the company thereby are inviolable.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK
and WILLIAMS, JJ.; TRUNKEY, J., absent.

No. 155 July Term 1886, Sup. Ct.; court below, No. 1 Sep-
tember Term 1884, in equity.

On July 14, 1884, an agreement for an amicable proceeding
in equity was presented, wherein The Phil., Wilmington &
Balt. R. Co., was plaintiff and The Mayor and Members of the
City Council of the city of Chester, their agents and employ-
ees, were defendants, wherein it was agreed between the said
parties as follows:

1. That it shall be taken and considered that a proceeding
to the above form is pending in the said court between the
above parties, and that the same has proceeded by bill, answer
and replication.

2. That the several ordinances, copies of which are hereunto
appended and marked exhibits A and C, were enacted by the
councils of the said city and approved by the mayor thereof;
that the agreement, a copy of which is hereunto appended and
marked exhibit B, was executed by the respective parties
thereto and delivered; that the sections of the several acts of
the general assembly of the commonwealth of Pennsylvania,

### Statement of Facts.

copies of which are hereunto appended and respectively marked exhibits D and E, are correctly stated as parts of the statutes enacted by the general assembly and approved by the governor of the said commonwealth; and that none of the ordinances, nor acts of assembly, nor the said agreement, nor any of them, have been altered, amended, repealed or canceled.

3. The said complainant avers that pursuant to the said ordinances and agreements and upon the faith thereof the said company has erected and donated to the said city, at a large outlay of money, the abutments and superstructure of a bridge according to the specifications of the said agreement; and further, pursuant to and upon the faith of the said ordinances and agreement the said company has erected and constructed, at a large outlay of money, in the vicinity of the said Pennell street bridge, a block signal station, a water station, and has made alterations and arrangements with respect to the crossing and connection of the tracks of the railroad of the said company, at and near the point where the said street crosses the said railroad, so as to promote the convenience and safety of travel, both upon the said railroad and upon the said highway.

4. That the said mayor and council are about to enact an ordinance of the said city altering the grade of Pennell street mentioned in the said ordinances and agreement, and are about to change the grade of the said street and open the same, in such manner that the said street will cross the road bed and tracks of the said company, complainant, at a level grade, and thereby destroy the over-head crossing now existing, over the said bridge.

5. The said company, complainant, avers that by virtue of the said ordinances and agreement, and of the said above recited laws and all other laws applicable to the case; by virtue of the expenditures made by the said company in fulfilment of its part of the agreement which has been fully complied with by the company; by reason of many and extensive arrangements, appliances and fixtures made and constructed in and about the said Pennell street by the said company since the date of the said agreement, and upon the faith thereof, for the better insuring the safety and convenience of public travel

both upon the railroad of the said company and upon the said street at the said crossing; and by reason of all the acts of the said parties under and pursuant to the said agreement and of all the circumstances surrounding the said parties at the date of the execution of the said agreement and since occurring, the said company, complainant, is entitled in equity, to have the said agreement decreed to constitute a valid and binding contract between the parties, whereby the grade of the said street has become established and should be maintained over the said railroad at the height in the said agreement specified, and to have a further decree enjoining the said defendants, or any of them, from the enactment of any ordinance or performance of any act whereby the grade of the said Pennell street shall be altered so as to make a level or grade crossing of the said street over the railroad of the said company, or in any manner interfered with or altered contrary to the conditions and specifications contained in the said agreement, and that the damage is irreparable and said plaintiff has no adequate remedy at law.

6. That the said defendants deny the plaintiff's averments and the legal and binding character of the said ordinances, agreement and laws, and the equities of the complainant thereunder.

7. That the court shall appoint an examiner and master to take testimony upon all facts in dispute between the parties and make report with the full power to such officers in equity, and that this proceeding shall continue by evidence, report and hearing, to final decree in all respects according to the rules and practice governing in equity proceedings; and if the court shall be of opinion, that the said company complainant is entitled to equitable relief in the manner herein above stated, then the said court shall enter a decree in favor of the said company complainant, in such form as to the court shall seem equitable and just, enjoining the said defendants and every one of them perpetually from altering or interfering with the grade of the street as hereinbefore specified; and shall grant such other relief as equity may require as fully as if a bill had been filed by the said complainant, with prayer therein for an injunction and relief: Otherwise the said court shall enter a decree in favor of the defendants with the same

effect as if a bill filed in manner aforesaid had been dismissed; and it shall be considered that the said defendants have been enjoined in manner above stated with the same effect as if a preliminary injunction had been issued by the said court and continued until final decree or other order of the court.

8. That either party may appeal from the final decree and have the same reviewed by the Supreme Court, and that the costs shall be paid by the party against whom the decree is finally entered.

EXHIBIT A.

ORDINANCE, directing the opening and grading of Pennell street, and changing the grades thereon between Third and Seventh streets.

§ 1. The Mayor and Council of the city of Chester do ordain, that the Street Committee of said council be and they are hereby authorized and instructed to open to public use and travel Pennell street, between Third and Seventh streets, according to the lines as they are noted on the approved plans of the city, and grade the same as hereinafter provided.

§ 2. The City Surveyor is hereby authorized and instructed to change the grade lines, and to mark the said changes on the plans of the city as follows: At a point 550 feet northwardly of the curb line of Third street, the grade upon either side of the street will be represented by the figures 34.00. At a point 300 feet south of the curb line of Sixth street the grade upon either side of the street will be represented by the figures 41.15. Provided, That no contract for the opening or grading of said street shall be valid until an agreement be first had in writing with the President of the Philadelphia, Wilmington and Baltimore Railroad Company to erect good and substantial stone abutments and wing walls and span the same with an iron superstructure of an approved plan, and fully complete the same for public use and travel over and upon said streets.

Enacted into an ordinance this 19th day of May, 1874.

EXHIBIT B.

This agreement, made and executed this second of July, A. D., 1874, between the city of Chester, acting by the Mayor, President of Council and Street Committee of the Council

·thereof, of the first part, and the Philadelphia, Wilmington and Baltimore Railroad Company, of the second part: Witnesseth as follows; that is to say:

1. For and in consideration of the undertakings and agreements hereinafter specified to be done and performed by the said Railroad Company, the said city of Chester hereby contracts and agrees, with the said Company, that Pennell street in the said city, between Third street and Seventh street, shall be open to public use and travel; and that the grade of said Pennell street shall be established and fixed in accordance with the grades, lines and marks ordained by the Mayor and Council of the said city, by ordinance approved May 19, 1874, entitled: "An ordinance directing the opening and grading of Pennell street, and changing the grades thereon between Third and Seventh streets," the said grades being so established and fixed with the intent and purpose of having the said Pennell street cross the said railroad at such a height, not less than eighteen feet above the top of ties of the said railroad, as will permit the free operation of the same under the said street and prevent the dangers of a crossing of said railroad by said street at level grade.

2. And for and in consideration of the above recited contract and agreement of the said city, and of the establishment of the said grades as defined in the said ordinance, and with the intent and purpose of preventing a level or grade crossing over the said railroad by the said street as aforesaid, the said The Philadelphia, Wilmington and Baltimore Railroad Company hereby contracts and agrees with the said city of Chester as follows, that is to say: To build over the said railroad where the said Pennell street crosses the same, at the grades hereinbefore recited, an iron bridge as before described, and donate the said bridge with the appurtenances hereinafter enumerated to the said city; the said bridge and appurtenances are particularly described and enumerated as follows, that is to say: The abutments to be built of large boulders of Port Deposit stone, laid in cement, to have a base one half the height; in length twenty-six feet, with wings parallel with the face of abutment, and steps one and one half to one; the superstructure to be of iron twenty-four feet in width, with wooden flooring, and capable of carrying a load of one hundred

pounds per square foot, in addition to weight of structure, without straining any of its iron parts beyond ten thousand pounds per square inch.

In Testimony whereof, etc.

Exhibit C. was an ordinance of the city councils enacted August 17, 1874, ratifying and approving the foregoing contract.

Exhibit D. was § 3, act of April 2, 1867, P. L. 678, conferring powers upon the city of Chester to regulate roads, streets, lanes, alleys, courts, etc., and the heights, grades, widths, slopes and forms thereof, with all other needful jurisdiction over the same.

Exhibit E. was § 6, act of March 25, 1873, P. L. 376, as follows :

§ 6. That the Mayor and Council of the city of Chester, shall have power to grant to The Philadelphia, Wilmington and Baltimore Railroad Company, The Philadelphia and Baltimore Central Railroad Company, The Chester Creek Railroad Company, or any of them, or any of their successors or assigns, the use and occupation of the streets, lanes, courts, and alleys lying within three hundred feet of the said railroads, or any of them now opened or hereafter to be opened or established, to be used and occupied by the said railroad companies respectively, only so long as the said streets, lanes, courts and alleys shall remain open to public use and travel, and shall have the power to vacate any of the said streets, lanes, courts or alleys concerning which no grant as aforesaid shall have been made, subject to all the remedies of the owners of properties thereon to obtain compensation in damages, as are prescribed by existing laws in the case of opening streets in said city ; such grants as aforesaid, when made and approved by ordinance of the Mayor and Council, shall be as valid and effectual to transfer the rights and privileges therein contracted for to the said railroad companies, or any of them, or any of their successors and assigns, as if made between individuals ; and the Mayor and Council of the said city shall have power to enact ordinances, from time to time, as they may deem advisable and expedient for the purposes of this act.

Upon the filing of the foregoing agreement of parties, with the said exhibits, *Mr. J. N. Shanafelt* was appointed examiner to take testimony upon the facts in dispute and to make report thereof to the court.

On November 2, 1885, the examiner's report being filed, the cause was referred to *Mr. O. B. Dickinson*, as master, who on February 1, 1886, filed his report, which in part was as follows:

It is essential to a satisfactory view of the evidence to first clearly understand the points of dispute to which it was intended to apply.

The company complainant owns and operates a line of railroad extending through the respondent city with roadbed and appurtenances complete, and occupies within the limits of said city, substantially, if not precisely, the same site, and maintains the same grade as were occupied and maintained before the city of Chester had advanced to the dignity of a city or even of a borough.

The locality of the dispute between the parties is where Pennell street running north and south crosses the tracks of the complainant. The grade of the railroad as established; the natural grade of the land, and the official grade of the street as originally established, would all call for a grade crossing at this point. The point, though on the line of the P., W. & B. Railroad, is within a few feet of the junction of its tracks with the tracks of the Chester Creek R. Company, a line controlled and operated by the complainants. The point is known as Lamokin Junction, and immediately south or southwest of it are situate Lamokin station and the round-house and car shops of the Chester Creek Road. Almost in conjunction with the railroad buildings, but on opposite sides of the P., W. and B. Railroad tracks, two extensive establishments engaged in the manufacture of steel castings and railroad and other appliance have been erected and are now conducting their works. This point is also made the southern terminus of what may be termed, for the sake of description, a railroad line from Philadelphia to Chester.

All trains of the Chester Creek Road starting from Lamokin are required to run past Pennell street, in order to get back to Lamokin station on the main tracks of the P., W. and B.

Master's Report.

All these circumstances in the opinion of the managers of the railroad necessitated more frequent shifting of trains and a heavier amount of railroad travel at the place in question than on the general line of the road, and required special provisions for an overhead crossing for the protection of the traveling public both over the highway of the city and of the complainant. These are some of the reasons which supplied the motive on the part of the complainants to originally enter into the agreement now in dispute, and which influence them in upholding its binding character.

The contrivance which was devised and accepted to meet the necessity of the situation as above understood to be, was an overhead bridge spanning the roadbed of the complainants at the hight of twenty feet one inch from rail to top of the floor of the bridge. On the other hand, the approaches to the bridge on the south side are so abrupt and so illy protected, and the bridge itself so much above the general level of the street of which it forms a part, that the residents of the locality deem it difficult and dangerous of access and as marring the appearance of the street. The location of the manufacturing establishments, railroad station and buildings above-mentioned, has practically closed the avenues of outlet on the west of Pennell street nearly if not quite to the western limits of the city, and in the wisdom of the city council the opening of the streets east of Pennell has been thought unadvisable if not indeed unfeasible.

The locality both on the north and south of the railroad has within the last few years rapidly increased in population, and now a population of several thousand in the heart of a populous city finds itself divided and separated by an impassable barrier of railroads, with absolutely no other means of communication, except Pennell street, from Kerlin street on the east to Lamokin street on the west, a distance of more than half a mile.

At the time of the making of the disputed agreement Pennell street was unopened, and that portion of the city unbuilt, so that very little popular interest was excited in the question. Now, the locality is a well built part of the city, and as the improvements, which have since been erected, have been adapted to the original grade of the street and the change as made in pursuance of the agreement has been practically ig-

nored, there is a vigorous popular feeling against the bridge being maintained as it is.

The plan returned with the report of the examiner more accurately describes the bridge and its approaches than any words of the master could do.

From the testimony and evidence in the cause, and the admissions of the counsel of the parties, the master finds in addition to the general facts above mentioned, the following:

1. The averments of .the complainants in the third clause of the agreement upon which the clause proceeds are, in the opinion of the master, supported by the evidence and therefore found to be true. The expenditure of money by them on account of the arrangement therein referred to, was at least the sum of $6,525.41, not including a subscription of five hundred dollars toward the grading of Seventh street. The latter for anything which appears before the master would seem to have been a gratuity, as it cannot be found in the agreement between the parties as forming part of the consideration.

2. The counsel for respondent have requested the master to consider the averment in the fourth paragraph of the agreement for this case, to be an admitted element of fact therein.

3. The master further finds as a fact, for whatever it may be worth as an element in the case, that the present condition of the southern approach to the present bridge crossing is such as to render public travel in vehicles over the same to be inconvenient, difficult and dangerous, and that it seriously detracts from the value of the street as a public highway : also, that a street admitting of easy, safe and comfortable passage at or near the present location of Pennell street is now a necessary convenience to the residents of the city and the traveling public, as it affords practically the only means of access and communication between the northern and southern portions of the South ward.

4. The master is also obliged by the evidence before him to find that these elements of danger and obstruction to travel result either from the manner in which the city has performed its part of the agreement between the parties, or from the natural difficulties of its undertaking, and that the complainant, as is conceded, has faithfully and diligently observed all its covenants and properly done the work marked out for it,

with the single exception of leaving cracks and fissures in the floor of the bridge, permitting the passage of vaporous steam emitted by engines passing under it. This is, of course, a matter of easy remedy.

5. The approaches to the bridge could, at small expense, be so guarded and protected as to eliminate many of the present elements of danger, and relegate the question of the relative merits in this respect of a grade and overhead crossing at this point to the abstract question of their respective merits under the best conditions. . . . .

8. The bridge over the Philadelphia, Wilmington and Baltimore Railroad tracks which now forms part of the roadbed of Pennell street, is at the grade established by the ordinance of May 19, 1874.

Many of the above facts have been found by the master because testified to by the witnesses and discussed by counsel. They are conceded to have not a very strong bearing upon the substantial legal merits of the controversy.

The legal conclusions to which the master has arrived have been reached from a consideration of but few questions.

The due execution and delivery of the paper, upon the legal character and effect of which depends the respective rights of the parties to this suit, is admitted by the agreement for this action. That the party complainant has fully paid the consideration, the master finds is a fact.

It is contended on behalf of the complainant that a fair construction of the instrument and of the preliminary and ratifying ordinances to which it refers, and with which it is accompanied, would make it evident that the intentions and meaning of the parties were, that Pennell street be opened to public use and travel, and that the grade thereof, on either side of the right of way of the complainant, be thereafter maintained at the grade which by said paper and ordinances was "established and fixed." It was further urged that it must be evident to all unprejudiced minds that the purpose sought to be accomplished and the object which all the parties had in view, was the establishment and maintenance of an overhead crossing at this point; that whatever opinions may be entertained of the legal effect of this paper, the consideration moving from the railroad company and the contemporary acts, and construction

given to it by the parties, preclude all right as to what was meant; that the complainants moreover have, by the exercise of unquestioned good faith on their part, entitled themselves to the right to seek to uphold in all its integrity a bargain fully understood and fairly entered into. On the other hand, as they were dealing not with the public, the real party in interest, but with persons who were known to act only in a representative capacity, they assumed the risk of the authority of the agent to bind the principal; and the legal and moral right of the principal, who feels he was worsted in the bargain, to test the powers of the agent, must likewise be conceded. This brings us to a consideration of what is really the only question in the case, the binding character in law of the agreement of the parties as gathered from the ordinance of May 19, 1874, and August 17, 1884, and the instrument of July 7, 1874.

Under the foregoing findings of fact, the master, discussing Goszler v. Georgetown, 6 Wheat. 593; § 3, act of April 2, 1867, P. L. 678; § 6, act of March 25, 1873, P. L. 376; act of June 9, 1874, P. L. 282; act of June 19, 1871, P. L. 1360; and § 12, act of April 4, 1868, P. L. 62, held that the validity of the contract must depend, if upon anything, upon the act of March 25, 1873; that while a municipality has no power to make a contract which would control or embarrass its legislative powers over its streets, or prevent its regulation of their use by all persons: Presbyterian Church v. New York, 5 Cow. 538; State v. Stuyvesant, 7 Cow. 588; Pullman v. Mayor of New York, 34 Barb. 169; N. Y. & H. R. Co. v. Mayor of New York, 1 Hilt. 562; Maryland v. Graves, 19 Md. 351; yet, where the legislature of the state has by clear enactment conferred upon the municipality the power to contract with respect to a given subject, and the municipality does so contract, it is irrevocably bound by it, even though the effect may be the impairment of a legislative function: C. & S. R. Co. v. Carthage, 36 Ohio 631. But every intendment would be against the existence of the power in a municipality to barter away the rights and franchises essential to the maintenance of all its functions in their full rigor: Addis v. Pittsburgh, 85 Pa. 379; Fowler v. Bank of Pittsburgh, 72 Pa. 456; Duncan v. Penn. R. Co., 94 Pa. 444; Branson v. Philadelphia, 47 Pa.

Master's Report.

332; Southwark R. Co. v. Philadelphia, 47 Pa. 314; Sharpless v. Philadelphia, 21 Pa. 162. The master then proceeded:

In the light of these decisions and many others which might be cited, was the power attempted to be exercised through the ordinances in question conferred by the act of March 25, 1873?

It is conceded that if it was not given by this act it clearly was not by the others.

In the first place, did the property which is the subject matter of the agreement belong to the city, in what may be termed its individual corporate capacity, or belong to it in its public political character? If the former, the complainants have a clear right to hold them to their bargain: Western S. Fund v. Philadelphia, 31 Pa. 175.

A mere glance at the contract resolves this question against the complainants. The subject matter of the contract was a public highway. The strictest rules must therefore be applied against the grant of power.

This act of assembly confers in plain and unambiguous terms upon the mayor and council of the city two powers: (1.) To grant to the complainants the use and occupation of all streets lying within three hundred feet of the railroad to be used and occupied by it only so long as the said streets shall remain open to public use and travel. (2.) To vacate any of the said streets concerning which no grant as aforesaid shall have been made.

1. It is apparent that the same right cannot be claimed as conferred by virtue of both these powers, for they are mutually destructive. The complainant can claim the right to use and occupy the street only so long as it is open to public use and travel, and the city can vacate only when the right to use and occupation has not been granted to the railroad. It would also seem clear that the assertion of the right which the complainant is insisting upon, is itself a denial of the power of the city to grant that right under the first of the above enumerated powers. The moment they establish the validity of their contract as a grant of the use and occupation of the street, eo instante they establish also a similar and equal right to the public.

The use and occupation need not be necessarily a horizontal one, per Lewis, J.: Commonwealth v. Railroad Co., 27 Pa.

344, but whatever their right is, it is enjoyed in common with the public and cannot be exclusive.

2. The validity of their contract, therefore, must depend upon the power of vacation. Was Pennell street vacated by the ordinance of May 19, 1874? If the ordinance accomplished any such result it was the very opposite of that declared by the title to be the intention of its passage, for it is entitled "Ordinance directing the opening and grading of Pennell street and changing the grades thereon," etc., and it is also in direct violation of the solemn undertaking of the city. It was contended before the master that the purpose was to vacate the portion of Pennell street occupied by the railroad. If such was their purpose, it is clear that they failed to carry it into effect. The ordinance and agreement both provide for nothing to be done by the city other than the opening and grading of the street. Waiving the question whether the legal import of the words used make out an undertaking on the part of the city to forever maintain the grade as fixed and established by the ordinance of May 19, 1874, the master concludes that the act does not disclose with sufficient clearness the existence of the power in the city council by whom the ordinance was enacted, to prevent the exercise by the present or any future council of the same right which they claim and exercise for themselves.

There is another view of the case which the master has not stopped to elaborate, but which is equally fatal to the complainants' case. Admitting the power of the then council to enter into the contract referred to, the contract when made and the rights of the parties under it, as under all other contracts entered into by any other persons, were necessarily subject to legislative powers and authorities confided to the municipality in its public political character: As the right to enforce police regulations or abate nuisances: Presbyterian Church v. New York, supra; Stuyvesant v. Same, supra. Also the right of eminent domain: In re Towanda Bridge Co., 91 Pa. 216. In neither view, of course, is the right of the complainants to recover compensation for the damages which may be suffered by it by reason of the change of grade, affected or intended to be passed upon. It remains only to discuss briefly the remaining general question proposed.

3. Are the complainants in any event entitled to the injunction which they ask? It is settled law that the court will not inhibit the passage of an act of assembly or ordinance because of its alleged invalidity as the "impairment of a contract." They will always wait until some act is attempted under it and then restrain the unauthorized act: Smith v. McCarthy, 56 Pa. 359; Chicago v. Evans, 24 Ill. 52; Des Moines Gas Co. v. Des Moines, 44 Ia. 505; Sheridan v. Calvin, 77 Ill. 237; Milhan v. Sharp, 15 Barb. 195; s. c. 9 N. Y. 263; Davis v. The Mayor, 14 N. Y. 506.

If the position of the complainants on the general question be a sound one, the passage of the threatened ordinance without more, will damage them nothing. When steps are taken by the city to make the ordinance available, the courts may be asked to interfere.

The master would therefore recommend a decree in favor of the respondents and against the complainant in conformity with the agreement of the parties to this action, dissolving the preliminary injunction supposed to have been issued and dismissing the bill of complainant with costs.

Various exceptions to the foregoing report were overruled by the master, and were then renewed in court. On argument thereof, the court, CLAYTON, P. J., on June 7, 1886, filed the following opinion and decree:

The very able report of the learned master to whom the case was referred, leaves but little if anything more for consideration.

It will hardly be seriously contended that a municipality, by any form of ordinance or agreement, can deprive itself of any of its delegated powers. It is a mere trustee invested by the sovereign power of the state with the exercise of certain powers for the good of the people of the town. No matter what the consideration, or how honest the intention of the parties, the city, in this case, had no more right to bargain away the control of the future municipal authorities over its streets than an ordinary trustee could sell in fee the lands held by him in trust, without the power of alienation.

The roads and streets of the country belong to the state. The city is but the agent of the state. The delegated power

of the city is well defined.   It must exercise the necessary police authority over the streets, must keep them unobstructed and in good and safe traveling order.   It may fix grades and change them as public exigencies may require.   It may bridge over or tunnel under dangerous places, and in a word do whatever, in its judgment and discretion, is necessary for the public good.   The instant it exceeds any of its delegated powers or attempts to bind itself from their honest exercise, its acts are ultra vires and void.   Among the student's first lessons is the rule for construing statutes: " Acts of parliament derogatory from the power of subsequent parliaments bind not."

It may be conceded that the state could make a binding contract for a sufficient consideration with a private person or corporation.   It could, therefore, delegate that power to the city, and the sole and single question in this case is, has it done so ?   The plaintiff claims that the act of March 25, 1873, P. L. 376, gives to the city the necessary authority.   A careful reading of the act clearly shows that it has no application whatever to the case.   The authorities are uniform that such legislation, to be effective, must be clear and unambiguous, and is to be strictly construed in favor of the government.   The object of the act was not to regulate bridges over, or tunnels under, the railroad.   Its purpose was to give the city power, in its discretion, to permit the railroad to occupy certain streets therein named.   Nothing but the most liberal and enlarged construction can give to the statute the meaning contended for by the plaintiff.   The reasoning of the master, and the authorities cited by him in support of his views, are conclusive upon this point.

I entirely concur in all the conclusions to which the master has arrived.   The exceptions are overruled and the bill dismissed with costs to the defendants.

Thereupon the plaintiff took this appeal specifying as error the decree dismissing the bill with costs to the defendants.

*Mr. William Ward,* for the appellant:

1. Whenever it is reasonable to accomplish such a result, grade crossings will be avoided both over railroads and over highways, as far as the voice of the courts can influence in that direction : West Penn. R. Co.'s App., 99 Pa. 155 ;

Arguments.

North. Cent. Ry. Co.'s App., 103 Pa. 621; Sterrett Tp. Road, 19 W. N. 76. In the same line are the acts June 19, 1871, § 2, P. L. 1361; June 9, 1874, P. L. 282.

2. Under the statement of facts found, the complainant shows full compliance on its part with the obligations of the contract of July 2, 1874, and it is entitled to protection in the enjoyment of its advantages secured under it; having made the expenditures on the faith of the contract entered into by the city, the city has no power to abrogate it: Western S. Fund v. Philadelphia, 31 Pa. 175.   Goszler v. Georgetown, 6 Wheat. 593, which seems to bear most strongly in support of respondent's position, involved the consideration of an ordinance, and not a contract.

3. The exact letter of the act of March 25, 1873, covers this case.   It is admitted that Pennell street is within the three hundred feet limit prescribed by the act.   The act provides for the grant to the railroad company of the use and occupation, either jointly with the public or exclusively, or to any extent, and in whatever manner the two contracting parties may decide.   In fact, the power is given to contract for the absolute vacation and obliteration from the city map of any street decided upon for the use of the railroad company.

4. Statutes are to be construed so as may best effectuate the intention of the makers; all laws must be executed according to the sense and meaning that they imparted at the time of their passage: Commonwealth v. Fraim, 16 Pa. 169; Big Black Creek Imp. Co. v. Commonwealth, 94 Pa. 455; Commonwealth v. Railroad Co., 27 Pa. 353; and the causes which induced the passage of the act are strongly set forth and commended by Mr. Justice STERRETT, in West. Penn. R. Co.'s App., 99 Pa. 155.

*Mr. Orlando Harvey* (with him *Mr. D. M. Johnson*), for the appellees:

1. Even if the appellant be correct in its contention that a correct reading of the agreement and the spirit of it imply a restriction upon the power of future councils to alter the grade or restore it to its original position, we contend that it would not be competent for any council to make such a binding contract, and any attempt to do so would be void, as against pub-

lic policy, and a surrender of inalienable powers. The mere power to regulate and grade streets includes the power to re-grade : Hummelman v. Hoadley, 44 Cal. 213 ; Creale v. Keokuk, 4 Greene (Ia.) 47 ; and the power to grade and improve streets is a continuing one, unless the contrary be indicated, and it may be exercised from time to time as the wants of the municipality may require : New Haven v. Sargent, 38 Conn. 50 (9 Amer. R. 360) ; Smith v. Washington, 20 How. (U. S.) 135 ; Gale v. Kalamazoo, 23 Mich. 344 ; McCormack v. Patchin, 53 Mo. 33 (14 Amer. R. 442) ; and of the necessity or expediency of the exercise of this power, the governing power of the corporation, and not the courts, are the judges : McCormack v. Patchin, supra ; Chicago v. Wright, 69 Ill. 318.

2. The public, and not the officers of a city, constitute the corporation ; and the city cannot by contract dispose of its franchises, and abridge its legislative discretion : Chicago v. Wright, supra ; Maryland v. Graves, 19 Md. 351 ; Milhan v. Sharp, 27 N. Y. 611 ; Clark v. Rochester, 54 Barb. 446 ; Clark v. Demoines, 19 Ia. 199 ; Cooley on Const. Lim. 206 ; N. Y. & H. R. Co. v. Mayor of N. Y., 1 Hilt. 562 ; Leavenworth v. Rankin, 2 Kan. 371 ; Dillon, Mun. Corp., §§ 61, 381–2 ; Appleby v. Mayor of N. Y., 15 How. 428 ; Presbyterian Church v. New York, 5 Cow. 538 ; Snow v. Deerfield Tp., 78 Pa. 181 ; Mott v. Penn. R. Co., 30 Pa. 9 ; Branson v. Philadelphia, 47 Pa. 329 ; Sharpless v. Philadelphia, 21 Pa. 182 ; Duncan v. Penn. R. Co., 94 Pa. 444 ; Johnson v. Philadelphia, 60 Pa. 445 ; Citizens' Pass. Ry. Co., 2 Pittsb. 10 ; Fox v. Cincinnati, 21 Amer. L. Reg., N. S., 417.

3. In view of the foregoing, it will not be questioned that we have the right to insist on a strict construction of the act of March 25, 1883. From the words of the act, the council had the power : (1) to grant the use and occupation of the streets to the railroads, while they remained open as streets ; (2) to vacate any other streets within the prescribed distance from the railroads. But it is not asserted that council attempted to vacate Pennell street. Then did council grant the use and occupation of that street to the railroad company? The company asserts no right to the use of the bridge ; it passes its cars and locomotives along its railroad under the bridge, but precisely in the same manner as before the bridge

was built. It is clear then that no use or occupation was granted by the ordinances or the agreement, at least in clear and unambiguous language: Sharpless v. Philadelphia, 21 Pa. 182; Lafayette v. Cox, 5 Ind. 38. Evidently, the act of assembly was not in the minds of those who prepared either the ordinances or the agreement, or, if in mind, it was not believed to bear on the subject; and it must not be overlooked that neither the ordinances nor the agreement contain any restriction upon future legislation on the part of councils, with reference to the grade of the street.

OPINION, MR. JUSTICE GREEN:

The act of March 25, 1873, P. L. 376, contains in the concluding clause of section 6, the following provision: "Such grants as aforesaid, when made and approved by ordinance of the mayor and council, shall be as valid and effectual to transfer the rights and privileges therein contracted for to the said railroad companies, or any of them, or any of their successors and assigns, as if made between individuals; and the mayor and council of the said city shall have power to enact ordinances from time to time as they may deem advisable and expedient for the purposes of this act." The agreement of July 2, 1874, between the city of Chester and the P. W. & B. R. Co. was duly approved by an ordinance of the city council on August 17, 1874, and, so far as it was in the power of these contracting parties to do so, they bound themselves to the just performance of all the terms of that contract. If the question now at issue arose out of a contract between individuals, there would not be a moment's doubt as to its determination. As a matter of course, neither the parties, nor the legislature, nor the courts, could disregard the terms of the contract; nor could any rights acquired under it be defeated, taken away or impaired without the consent of the party affected. By necessary consequence it follows, that if the grants made by the city to the railroad company by the contract of July 2, 1874, were within the lawful power of the city under the act of 1873, the city is bound by them with the same effect in all respects as if it were an individual.

Does that act confer the power to make the contract of July 2, 1874? If it does, there is an end of the discussion.

The act is special and local. It confers expressly certain powers upon the city of Chester to make certain grants to the Philadelphia, Wilmington & Baltimore Railroad Company. So far as the parties are concerned, and so far as the contracting power is concerned, and the quality or legal character of any actual exercise of that power, there is no kind of question. The one. solitary question in this case is, so far as this branch of it is concerned, whether the contract of July, 1874, was an exercise of the power conferred by the act of 1873. This involves an interpretation of the act. Its terms are as follows: "That the mayor and council of the city of Chester shall have power to grant to the Philadelphia, Wilmington & Baltimore Railroad Company, The Philadelphia & Baltimore Central Railroad Company, The Chester Creek Railroad Company, or any of them, or any of their successors or assigns, the use and occupation of the streets, lanes, courts, and alleys lying within three hundred feet of the said railroads, or any of them now opened or hereafter to be opened or established, to be used and occupied by the said railroad companies respectively, only so long as the said streets, lanes, courts and alleys shall remain open to public use and travel, and shall have the power to vacate any of the said streets, lanes, courts or alleys, concerning which no grant as aforesaid shall have been made."

Referring now to the terms of the contract, we find that in consideration of the undertakings to be performed by the company, the city agrees that Pennell street shall be open to public use and travel between Third and Seventh streets, and that the grades of the street shall be fixed in accordance with the grades, lines and marks ordained by an ordinance approved May 19, 1874, entitled "An ordinance directing the opening and grading of Pennell street and changing the grades thereon between Third and Seventh streets, the said grades being so established and fixed with the intent and purpose of having the said Pennell street cross the said railroad at such a height, not less than eighteen feet above the top of the ties of the said railroad, as will permit the free operation of the same under the said street and prevent the dangers of a crossing of said railroad by said street at level grade." Then follows the stipulation of the company thus: "And for and in consideration of the above recited contract and agreement of

the said city and of the establishment of the said grades as defined in the said ordinance, and with the intent and purpose of preventing a level or grade crossing over the said railroad by the said street as aforesaid, the said The P. W. & B. R. Co. hereby contracts and agrees with the said city of Chester as follows: that is to say, to build over the said railroad where the said Pennell street crosses the same, at the grades hereinbefore recited, an iron bridge as before described and donate the said bridge with the appurtenances hereinafter enumerated to the said city." Then follows a description of the manner in which the bridge shall be built.

In substance, this means that the street shall be opened and used at certain grade lines so fixed that the street shall be at an elevation of eighteen feet above the railroad and that the railroad shall be operated freely under the said street, and that a crossing of the railroad by the said street at grade shall be prevented. It means, also, that the railroad company shall so use the ground over which Pennell street would necessarily be laid, if it crossed the railroad at grade, as that such a crossing shall not be permitted, and hence that portion of Pennell street which would cross the railroad at grade is devoted to the exclusive use of the railroad. If Pennell street had then been laid out and opened, it cannot be questioned that the subsequent use of the street at the place of crossing, under the contract, would have been the use of a part of that street, and hence it would come within the very words of the power granted by the legislature to the city.

Whether the user of the street granted by the contract was longitudinal or transverse, is immaterial in considering the question of power, since the act which gives the power authorizes the city to grant "the use and occupation of the streets etc., or any of them now opened or hereafter to be opened or established," without any limitation as to the extent or manner of the use. The use of the street crosswise its direction, or lengthwise, is of the same generic character, and, where it is exclusive, it is just as effectual if it be sixty feet as if it were six hundred.

But, more than this, the railroad company is to build that portion of Pennell street which crosses the railroad. The street at this point is to consist of abutments twenty-six feet long and a superstructure of iron " twenty-four feet in width

with wooden flooring and capable of carrying a load of one hundred pounds per square foot in addition to weight of structure." This part of the street is to be constructed at the cost of the railroad company and donated to the city in consideration of the previous contract of the city, and the railroad company is prohibited from using any part of the street so as to constitute a grade crossing. In this sense also, therefore, the provision of the contract is a provision in regard to the use of the street; and, while it is negative in that it prohibits the use of the street, it is affirmative in that it grants the exclusive use of that portion of the street which would necessarily be used as a street if a grade crossing were established. Moreover the construction of the street at an elevation for purposes of use, with a prohibition against the use of a grade crossing, is so necessarily and fundamentally germane to the power conferred by the act to grant "the use and occupation" of the streets, that, if there were any doubt upon the subject, we would feel quite justified in holding it to be included by necessary implication in the general grant of power expressed in the act.

We have no difficulty, however, in holding that the power exercised by the city in making the contract in question comes within the letter of the act, and hence the rights conferred by the contract upon the railroad company are inviolable. This view of the case renders unnecessary the consideration of the several matters discussed in the printed arguments. There is no question as to the performance by the railroad company of its part of the contract, and the question of the right of a municipality to grant away its control of the streets is foreign to the discussion. If there is a legislative grant of the power in controversy, to the municipality, it is only necessary to consider whether that power has been exercised. We hold that it has been in the present case, and by the express terms of the law the city is as completely bound by it as though it were an individual.

> The decree of the court below is reversed at the cost of the appellees; and the record is remitted with direction that an injunction be awarded in conformity with the terms of the agreement of the parties under which this proceeding was commenced.